UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

12-CV-8291 (PGG)

JACQUES WAKEFIELD,

Plaintiff,

– against –

CITY OF NEW YORK, POLICE OFFICER CARLOS

PAGAN, and POLICE OFFICERS JOHN DOE 1

THROUGH 10, EACH IN THEIR INDIVIDUAL AND

OFFICIAL CAPACITIES,

Defendants.

**FIRST AMENDED**

**COMPLAINT**

**JURY TRIAL**

**DEMANDED**

Plaintiff JACQUES WAKEFIELD, by his attorneys, Galluzzo and Johnson LLP, for his

Complaint against Defendants CITY OF NEW YORK and POLICE OFFICERS John Doe 1

through 10 (hereinafter "Defendant Police Officers"), employed by the New York City Police

Department each in their individual and official capacities, upon personal knowledge and upon

information and belief, alleges as follows:

### NATURE OF THE ACTION

1.      On September 10, 2011, at approximately 1:00 PM, Plaintiff was at or near the

intersection of W. 135th Street and Riverside Drive in the County of New York.  At this time,

Defendant Pagan and Defendant Police Officers without any cause or articulable reason,

proceeded to search Plaintiff without any legal authority, permission, or consent to do so near

604 West 135th Street in the County of New York.  The search yielded no contraband or fruits of

any crime whatsoever, resulting in no reasonable cause to believe that Plaintiff had committed any arrestable offense. Then, without justification, Defendant Pagan and Defendant Police Officers proceeded to arrest Plaintiff, who was thereafter transported against his will to the 30th Police Precinct. As a result, the Plaintiff was subjected to unjustified, demeaning, and humiliating incarceration for approximately 13 hours. The New York County District Attorney's Office reviewed the arrest and declined to prosecute Plaintiff for any offense. Shortly thereafter, Plaintiff was released from custody.

2.      Plaintiff brings this action against Defendant Pagan and the aforementioned Police Officers, and their employer, the City of New York, for personal injuries and damages for assault, battery, false arrest, false imprisonment, and violation of civil rights in accordance with 42 U.S.C. § 1983, and other relevant law.

## PARTIES

3.      Plaintiff JACQUES WAKEFIELD is a resident of Kings County, New York.

4.      Defendant City of New York ("CITY") is, and was at the time of the incident giving rise to this action, a municipal corporation duly organized under, and existing by virtue of, the laws of the State of New York. At all times relevant to the action, Defendant CITY employed the remaining Defendant Police Officers in connection with its control, operation, and maintenance of the New York City Police Department.

5.      Defendant Carlos Pagan is a Police Officer assigned shield number 26430, employed by the New York City Police Department and at all relevant times was acting in his capacity as an agent, servant, and employee of the CITY.

6.      At all relevant times, herein, defendants John Does 1 through 10 were Police Officers employed by the New York City Police Department and were acting in the capacity of

agent, servant, and employees of the CITY. The true names of Police Officers John Doe 1 through 10 are not currently known to Plaintiff.

## JURISDICTION AND VENUE

7.    This Court is empowered by 28 U.S.C. §§ 1331, 1343, 1367 and 2202, to hear and decide these claims for relief.

8.    This Court has pendent and supplemental jurisdiction over all claims asserted herein under the laws of the State of New York pursuant to 28 U.S.C. § 1367(a).

9.    Venue is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(a), (b) and (c), as all material events described in this Complaint occurred in New York County, New York.

## PROCEDURAL REQUIREMENTS

10.    Plaintiff has complied with General Municipal Law Section 50(h) and all procedural requirements necessary to commence a lawsuit against Defendants, including Defendant CITY.

11.    This is an action for psychological injuries and damages, among other things, sustained by Plaintiff arising out of actions perpetrated by Defendant Police Officers on September 10, 2011.

12.    On or about October 26, 2011, and within ninety days after the accrual of the instant action, a satisfactory Notice of Claim was filed with Defendant CITY on behalf of Plaintiff. The Defendant CITY acknowledged receipt of claim on October 31, 2011; and whereafter no hearing pursuant to Section 50(h) was requested.

13.    Defendant CITY, and/or its agent(s), has refused or neglected to make any adjustment or payment on Plaintiff's claims (as stated in Plaintiff's Notice of Claim).

14.    Plaintiff commences this action within one year and ninety days of the date of accrual of the instant action.

## FACTUAL ALLEGATIONS

15.    On September 10, 2011, at approximately 1:00 PM, Plaintiff was at or near the intersection of W. 135th Street and Riverside Drive in the County of New York. Plaintiff was not engaged in any criminal activity at that time or at any time prior on that date.

16.    That afternoon, Defendant Pagan and Defendant Police Officers were present near 604 W. 135th Street in the County of New York.

17.    Without cause or explaining what they were doing and why, Plaintiff was arrested and searched by Defendant Pagan and Defendant Police Officers.

18.    At the time, without reasonable cause, Defendant Pagan and Defendant Police Officers searched Plaintiff's person, and Plaintiff complied without resistance.

19.    Defendant Pagan and Defendant Police Officers did not recover any contraband from Plaintiff after thoroughly searching his person.

20.    Even though no contraband was recovered from Plaintiff, Defendant Pagan and Defendant Police Officers arrested Plaintiff without probable cause or reasonable suspicion that any offense had been committed.

21.    Plaintiff was then transported by Defendant Pagan and Defendant Police Officers against his will to the 30th Police Precinct of the New York City Police Department, where Plaintiff was held for approximately 13 hours.

22.    Plaintiff was photographed and fingerprinted.

23.    Shortly thereafter, on or about September 11, 2011 Plaintiff was released from the 30th Police Precinct without being issued a summons or desk appearance ticket, and without any charges whatsoever, whereby the New York County District Attorney's Office reviewed the arrest and declined to prosecute Plaintiff.

24.    As a result, Plaintiff was never brought before a judge nor arraigned on any accusatory instrument.

**FIRST CLAIM FOR RELIEF**

**BATTERY**

**As Against Defendants**

25.    Plaintiff repeats and realleges each and every allegation contained in the Paragraphs 1 through 24, inclusive, as though fully set forth at length herein.

26.    On September 10, 2011, Defendant Pagan and Defendant Police Officers intentionally initiated wrongful physical contact with Plaintiff without his consent.

27.    Defendant Pagan and Defendant Police Officers handcuffed and restrained Plaintiff without legal justification, causing Plaintiff to sustain psychological injuries.

28.    Defendant Pagan and Defendant Police Officers took these actions against Plaintiff during the course and within the scope of their employment with Defendant CITY.

29.    Defendant CITY is liable for the acts of its agents/employees, including, but not limited to, Defendant Pagan, Defendant Police Officers, taken against Plaintiff during the course, and within the scope, of employment with Defendant CITY, under the doctrine of *respondeat superior*.

30.     The actions taken by Defendant Pagan and Defendant Police Officers – and thus, by Defendant CITY – against Plaintiff were willful, wanton, reckless, and malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### FALSE ARREST

#### As Against Defendants

31.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 30, inclusive, as though fully set forth at length herein.

32.     On September 10, 2011, Defendant Pagan and Defendant Police Officers intentionally initiated wrongful physical contact with Plaintiff without his consent.

33.     Defendant Pagan and Defendant Police Officers handcuffed and restrained Plaintiff without legal justification, causing Plaintiff to sustain psychological injuries.

34.     Defendant Pagan and Defendant Police Officers took these actions against Plaintiff during the course, and within the scope, of their employment with Defendant CITY.

35.     Defendant CITY is liable for the acts of its agents/employees, including, but not limited to, Defendant Pagan and Defendant Police Officers, taken against Plaintiff during the course, and within the scope, of employment with Defendant CITY, under the doctrine of *respondeat superior*.

36.     The actions taken by Defendant Pagan and Defendant Police Officers – and thus, by Defendant CITY – against Plaintiff were willful, wanton, reckless, and malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

### <u>FALSE IMPRISONMENT</u>

#### As Against Defendants

37.    Plaintiff repeats and realleges each and every allegation contained in the Paragraphs 1 through 36, inclusive, as though fully set forth at length herein.

38.    During the Relevant Period, Defendant Police Officers intentionally caused Plaintiff to be imprisoned and confined at the 30th Police Precinct operated by the New York City Police Department, which is operated and controlled by Defendant CITY.

39.    Defendant Police Officers did not have probable cause or other justification to imprison and confine Plaintiff at the 30th Police Precinct.

40.    Plaintiff did not consent to the aforementioned imprisonment and confinement.

41.    The Defendant Police Officers actions caused injuries to Plaintiff, including psychological injuries and the deprivation of his liberty.

42.    Defendant Police Officers took the aforementioned actions against Plaintiff during the course, and within the scope, of their employment with Defendant CITY.

43.    Defendant CITY is liable for the acts of its agents/employees, including, but not limited to, Defendant Pagan and Defendant Police Officers, taken against Plaintiff during the course, and within the scope, of employment with Defendant CITY, under the doctrine of *respondeat superior*.

44.    The aforementioned actions taken by Defendant Pagan and Defendant Police Officers – and thus, by Defendant CITY – against Plaintiff were willful, wanton, reckless, and malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983

### As Against Defendants

45.    Plaintiff repeats and realleges each and every allegation contained in the Paragraphs 1 through 44, inclusive, as though fully set forth at length herein.

46.    By the aforesaid acts, all Defendants have violated Plaintiff's rights to the equal protection of laws under the Fourth and the Fourteenth Amendments among other violations to the United States Constitution, thereby giving rise to a cause of action pursuant to 42 U.S.C. 1983.

47.    The conduct and actions of Defendant Pagan and Defendant Police Officers, acting under color of law in falsely imprisoning and detaining Plaintiff, were done intentionally, maliciously, and/or with a reckless disregard for the natural and probable consequences of their acts. These acts had no lawful justification and were designed to and did cause mental and emotional harm and suffering to Plaintiff in violation of Plaintiff's Constitutional rights as guaranteed under 42 U.S.C. 1983, et seq. Defendant Pagan and Defendant Police Officers deprived the Plaintiff his Constitutional rights including, but not limited to, his rights under the First, Fourth, and Fourteenth Amendments guaranteeing due process, right to fair trial and equal protection under the law, and the Eighth Amendment guaranteeing protection from cruel and unusual punishment, and 42 U.S.C. 1983, et seq.

48.    The aforementioned actions taken by Defendant Pagan and Defendant Police Officers – and thus, by Defendant CITY – against Plaintiff were willful, wanton, reckless, and malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – MONELL CLAIM

### As Against Defendant CITY

49.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 48, inclusive, as though fully set forth at length herein.

50.    All of the acts and omissions by Defendant Pagan and Defendant Police Officers described above were carried out pursuant to overlapping policies and practice of the Defendant CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent and cooperation, under the supervisory authority of the Defendant CITY, its agency the NYPD, Defendant Pagan and Defendant Police Officers.

51.    Defendant CITY, by Defendant Pagan and Defendant Police Officers and their other policy making agents, servants and employees, authorized, sanctioned and/or ratified the individual police Defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

52.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY, all under the supervision of the ranking officers of the New York Police Department ("NYPD") including Defendant Pagan and Defendant Police Officers.

53.    The aforementioned customs, policies, usages, practices, procedures and rules of the CITY include, but are not limited to, the following unconstitutional practices:

      a. Fabricating evidence in order to justify (or attempt to justify) otherwise suspicion-less arrests;

b. Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

c. Discouraging police officers from reporting corrupt or unlawful acts of other police officers;

d. Retaliating against officers who report misconduct; and

e. Failing to intervene to prevent the above-mentioned practices when such practices reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

54. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

a. *Schoolcraft v. City of New York*, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

b. *Taylor-Mickens v. City of New York*, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

c. *Colon v. City of New York*, 09-CV-0008 (E.D.N.Y.) In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on *Iqbal/Twombly* grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

10

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

d. *Callaghan v. City of New York*, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct, *to wit*, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);[1]

e. *Williams v. City of New York*, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

f. *Dunlop v. City of New York*, 06-CV-0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

g. *Carmody v. City of New York*, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

h. *MacNamara v. City of New York*, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up

1. ————————————

[1] For a description of this case and the nearly $1 million settlement, *see*, Cate Doty, *Bike Riders in New York Win Settlement*, N.Y. Times, October 18, 2010, *available at* http://www.nytimes.com/2010/10/19/nyregion/19critical.html?r=1.

or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

    i.   *McMillan v. City of New York*, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

    j.   *Avent v. City of New York*, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

    k.   *Smith v. City of New York*, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

    l.   *Powers v. City of New York*, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

    m.   *Nonnemann v. City of New York*, 02-CV-10131 (JSR) (AJP), 2004 U.S. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicion-less, racially-motivated stop-and-frisk of a group of Hispanic youth);

    n.   *Richardson v. City of New York*, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

    o.   *Barry v. New York City Police Department*, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption

within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

p. *Walton v. Safir*, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

q. *White-Ruiz v. The City of New York*, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

r. *Ariza v. City of New York*, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department); and

s. *Sorlucco v. New York City Police Department*, 89-CV-7225 (CCH), 88 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting that a fellow officer had raped her).

55.    The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct, are further evidenced, *inter alia*, by the following:

a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[2]

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in *Colon v. City of New York*, 09 Civ. 00008 (E.D.N.Y.), in which he noted a "widespread […] custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner Kelly acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[3]

d. Defendant CITY's tacit condoning of and failure to supervise, discipline or provide remedial training when officers engage in excessive force is evidenced by its

1. ──────────

[2] Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/ 4%20-%20Mollen%20Commission%20-%20NYPD.pdf.
[3] Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

systematic disregard of the recommendations of the Civilian Complaint Review Board ("CCRB"). CCRB is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[4] When it does, however, Police Commissioner Kelly controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Kelly's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[5] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[6]

     e.   Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month and for pushing officers to falsify official documents. According to The New

1. ————————————

[4] In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted *de facto* policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.
[5] Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.
[6] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.
>
> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.
>
> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.
>
> Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.
>
> Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[7]

56.     The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence, are further evidenced, *inter alia*, by the following:

a.     The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[8]
>
> [...]

1.     _____

[7] Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-1114_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.
[8] Mollen Commission Report, p. 36.

What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[9]

b. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[10] Moreover,

Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[11]

1. _____

[9] Mollen Commission Report, pp. 40-41.
[10] Murray Weiss, *NYPD in a Liar Storm*, New York Post, October 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4Ndeqcl.
[11] *Id.*

c.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of criminal charges in connection with those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[12]

d.  In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.
>
> To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…

1. ─────────────

[12] John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

> [P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.
>
> "There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[13]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[14]

e.  In early 2010, the CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[15] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant District Attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense." According to the attorney for the Patrolmen's Benevolent Association, disciplinary charges against the officer are pending.[16]

f.  Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury

1. ───────────

[13]  Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, available at http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL..

[14]  John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[15]  In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, *available at* http://articles.nydailynews.com/2010-01-08/local/17943916_1_prostitution-charges-arrested

[16]  *Id.*

investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[17]

57.    The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct, are further evidenced, *inter alia*, by the following:

a.    Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

b.    In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

c.    Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

58.    The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY.

59.    The aforementioned actions of the INDIVIDUAL POLICE DEFENDANTS resulted from and were taken pursuant to the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members

1. _____

[17] David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors and commanders who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

60.    All of the foregoing acts by all Defendants deprived plaintiff of federally protected rights, including, but limited to, the right:

    a.   Freedom from unreasonable searches and seizures of his person;

    b.   Freedom from arrest without probable cause;

    c.   Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent;

    d.   Freedom from deprivation of liberty without due process of law; and

    e.   The enjoyment of equal protection, privileges and immunities under the laws.

61.    Defendant CITY knew or should have known that the acts alleged herein would deprive plaintiff of his rights, in violation of the Fourth and Fourteenth Amendments to the

United States Constitution.

62.    Defendant CITY is directly liable and responsible for the acts of Defendant Pagan and Defendant Police Officers because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

63.    Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

64.    The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, Defendant Pagan and Defendant Police Officers felt empowered to exercise unreasonable and wholly unprovoked force against plaintiff and arrest plaintiff without probable cause. Pursuant to the aforementioned CITY policies, practices and/or customs, Defendant Pagan and Defendant Police Officers failed to intervene in or report other defendants' violation of plaintiff's rights.

65.     Plaintiff's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

66.     The actions of Defendant Pagan and Defendant Police Officers resulted from and were taken pursuant to the foregoing *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which implemented by agents or employees of the NYPD, of employing wholly unprovoked and excessive force.

67.     Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiff's constitutional rights.

68.     As a direct and proximate cause of the acts of all defendants as set forth above, plaintiff suffered physical injury, loss of income, medical expenses, and severe mental anguish in connection with the deprivation of this constitutional and statutory rights guaranteed by the fifth and fourteenth amendments of the constitution of the united states and protected by 42 U.S.C. § 1983.

### SIXTH CLAIM FOR RELIEF

### PUNITIVE DAMAGES

### As Against Defendant CITY

69.     Plaintiff repeats and realleges each and every allegation contained in the Paragraphs 1 through 68, inclusive, as though fully set forth at length herein.

70.     As a result, Plaintiff was deprived of his liberty, suffered psychological and emotional injury, pain and suffering, and costs and expenses.

71.    By reason of the foregoing, Plaintiff demands judgment for punitive damages against the Defendants CITY, Defendant Pagan, and Defendant Police Officers in a sum exceeding the jurisdictional limits of all the lower courts.

## DEMAND FOR JURY TRIAL

72.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment in his favor and against Defendants, jointly and severally, for damages for the following relief:

a.  Compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial, with pre- and post-judgment interest;

b.  Reasonable attorney's fees and the costs of the instant action, including all costs incurred herein;

c.  Punitive damages;  and

d.  Such other and further relief as the Court deems proper and fair.

Dated: March 18, 2013

GALLUZZO & JOHNSON LLP

By: Zachary H. Johnson
48 Wall Street, 11th Floor
New York, New York 10005
Tel: 212.918.4661
*Attorneys for Plaintiff*